UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSICA ANN JACOBS,

    Plaintiff,

v.

DEAUDRE PERRY, et al.,

    Defendants.
_____/

Case No. 1:20-cv-358

Hon. Hala Y. Jarbou

## OPINION

This is a civil rights action asserting claims under 42 U.S.C. § 1983 and state law. Before the Court is Defendant's motion for summary judgment (ECF No. 49). For the reasons herein, the Court will deny the motion.

### I. BACKGROUND

Plaintiff Jessica Ann Jacobs was arrested and charged with larceny because of her name. On June 1, 2019, Officer Deaudre[1] Perry of the Battle Creek Police Department responded to a call regarding a stolen wallet. After Perry arrived at the scene, he spoke to the victim, Joshua Lewis. Lewis told Perry that he had been riding in a car with someone named Jessica Jacobs (the "suspect") and several other individuals and during that time the suspect took his wallet. (Perry Dep. 24, ECF No. 50-2.) Lewis did not realize the suspect had done so until she texted him later that day and asked for the PIN number for a card in his wallet. (*Id.* at 25.)

Perry testified at his deposition that Lewis gave him a "physical description" of the suspect but Perry does not recall that description. (*Id.* at 25-27, 31.) Perry likely did not write down that

---

[1] The complaint spells Defendant's first name as "Deaudrie," but the parties' most recent filings spell it as "Deaudre"; the Court will use the latter spelling.

description because it does not appear in his police report; the report reflects what was in his written notes. (*Id.* at 27, 31.)

After speaking with Lewis, Perry looked up the name Jessica Jacobs in the police department's "contact database," called the "RMS database." (*Id.* at 30-31.) It contains information about anyone with whom a police officer in Calhoun County has had contact with since 2013 or 2014. (*Id.* at 30, 54.) Plaintiff's information was in the RMS database. A name search in the RMS database can turn up anyone with that name or a similar name, including individuals who use the name as an alias. (*Id.* at 64, 74.) Perry acknowledges that his search returned at least one entry; he does not recall if there were others. (*Id.* at 33.) However, he does recall that the "Jessica Jacobs [he] looked up had an outstanding warrant for her arrest" (*id.* at 34); Plaintiff did not have a warrant for her arrest at the time. Inspector Brad Wise, who later investigated Perry's actions as part of disciplinary proceedings, confirmed that there were several individuals in the RMS database with the name Jessica Jacobs, two of whom had warrants for their arrest: Jessica Lynn Jacobs and Jessica Rose Jacobs. (Wise Dep. 44-45, ECF No. 50-9.) Also, a search returned information for Jessika Evelyeen-May McDonald because she had used the name "Jessika Jacobs" as an alias. (*Id.* at 48.)

Perry apparently tried to contact one of these individuals, using the telephone number listed in the database for that individual. (Perry Dep. 42.) He did not reach that individual. And he did not expect to have much success doing so because of the warrant for her arrest. In his experience, individuals with outstanding arrest warrants "are not very amenable to talk[ing] to the police." (*Id.* at 41.) He was not able to contact the suspect using the number in Lewis's phone because the battery in that phone had died. (*Id.* at 36.)

When Perry prepared his police report several hours later that day, he selected Plaintiff's name in the RMS database, populating her biographical information (e.g., home address, work address, age, race, sex, height, weight, race, hair color, and eye color) into his report. (*Id.* at 59, 65.) He does not recall if the description of the suspect matched the description of Plaintiff. (*Id.* at 60.)

In the narrative section of the report, Perry wrote the following:

> LEWIS stated he was in the car with the offender, JESSICA JACOBS, and two other males when he felt a tug on his back pocket while exiting the vehicle. He looked back and did not see that he had dropped anything.
>
> Several hours later, he received correspondence from JACOBS that she had his wallet and was attempting to use his cards. LEWIS wished to press charges against JACOBS reference the larceny of his wallet. . . . .
>
> \* \* \*
>
> JACOBS could not be located for an interview. It should be noted that JACOBS currently has an outstanding warrant. Therefore, locating her for an interview would be a challenge.
>
> \* \* \*
>
> LEWIS stated JACOBS was driving a silver four door vehicle. He did not know make or model.

(Incident/Investigation Rep., ECF No. 50-3, PageID.317.) Notably, this narrative contains no physical description of the suspect and mistakenly asserts that Plaintiff had a warrant for her arrest.

Using this report, Perry submitted a warrant request to the on-duty sergeant for approval. (Perry Dep. 40.) Sergeant Gensch approved the request. (Brady Dep. 9-10, ECF No. 50-16.) Officer Stephen Brady then sent the request to the prosecutor's office. (*Id.* at 9-11.) The prosecutor also approved the request and then Brady and the prosecutor swore to a misdemeanor complaint against Plaintiff. (*See* Misdemeanor Compl., ECF No. 50-4.) A magistrate judge approved the complaint on June 25, 2019. (*Id.*)

On September 2, 2019, police officers in Emmett Charter Township responded to a call at Plaintiff's home regarding "trouble between tenants and one of their mother[s]." (Field Contact, ECF No. 50-5.) The officers discovered the warrant for Plaintiff from Battle Creek so she went with them to the Calhoun County Jail for processing. (Compl. ¶ 12, ECF No. 1.) She bonded out of jail after spending two hours there. (*Id.* ¶ 13; Jacobs Dep. 48, ECF No. 50-7.)

Plaintiff retained counsel and told him that she had an alibi for the time of the larceny. (Jacobs Dep. 37.) However, it appears that neither she nor her attorney informed the police or the prosecutor about her alibi. The prosecutor dismissed the case against Plaintiff on October 31, 2019, after the victim failed to appear for trial.

Plaintiff brought this action in April 2020, asserting claims for "unconstitutional arrest and prosecution" under 42 U.S.C. § 1983 and for gross negligence under state law. (*See* Compl. 4-5.)

Perry asks for summary judgment, raising the defense of qualified immunity.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## III. QUALIFIED IMMUNITY

Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). It "'gives government officials

4

breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Plaintiff bears the burden of showing that Perry is not entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, Plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735.

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted). It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

5

*Id.* (citations and quotation marks omitted). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

## IV. ANALYSIS

The first step in the qualified immunity analysis is identifying the constitutional right claimed by the plaintiff. Here, Plaintiff asserts a single claim for "unconstitutional arrest and prosecution" (Compl. 4), which courts typically segregate into separate claims for "false arrest" and for "malicious prosecution." *See, e.g.*, *Buchanan v. Metz*, 647 F. App'x 659, 664 (6th Cir. 2016). These claims are grounded in the Fourth Amendment. "[T]the Fourth Amendment does not adopt separate bans on 'false arrests,' 'false imprisonments,' and 'malicious prosecutions.' It establishes a singular ban on 'unreasonable' 'seizures.'" *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160-61 (6th Cir. 2021) (quoting U.S. Const. amend. IV). "[T]his uniform ban bars all pretrial detentions without probable cause to believe that a detainee has committed a crime . . . ." *Id.* at 1161 (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 917-20 (2017)). Thus, "[a]lthough the legal standards for claims of false arrest and malicious prosecution under the Fourth Amendment are different, both claims turn on the existence of probable cause." *Buchanan*, 647 F. App'x at 664. "Probable cause exists where the 'facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense." *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

To prevail on a false arrest claim, Plaintiff must show that "the arresting officer lacked probable cause to arrest [her]." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). "An arrest pursuant to a facially valid warrant is normally a complete defense to a federal

6

constitutional claim for false arrest[.]" *Id.* However, Plaintiff can prevail if she proves "'(1) that the *officer applying for the warrant*, either knowingly and deliberately or with reckless disregard for the truth, made false statements or omissions that created a falsehood[,] and (2) that such statements or omissions were material to the finding of probable cause.'" *Tlapanco v. Elges*, 969 F.3d 638, 654 (6th Cir. 2020) (quoting *Halasah v. City of Kirtland*, 574 F. App'x 624, 629 (6th Cir. 2014) (emphasis added)).

> To prevail on a malicious prosecution claim, Plaintiff must prove the following:
>
> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was a lack of probable cause for the prosecution; (3) as a consequence of the prosecution, the plaintiff suffered a deprivation of liberty, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Buchanan*, 647 F. App'x at 665.

Considering the evidence in the light most favorable to Plaintiff, there is a question of fact about whether probable cause supported her arrest and prosecution. A reasonable jury could infer from the evidence that Perry simply selected Plaintiff's name from a list of several possibilities in the RMS database. Plaintiff's name alone was not sufficient to identify her as the suspect. Indeed, Perry's misstatement in the police report about the arrest warrant for Plaintiff suggests that Perry found more than one Jessica Jacobs in the police database. Although Perry testified that he chose Plaintiff based on her physical description, a jury could conclude otherwise. Perry cannot recall the description that he received from the victim and that description does not appear in his police report. In addition, he does not recall whether the description he received matches Plaintiff's description.

Perry argues that he simply selected the wrong person by mistake; however, he does not indicate which person he intended to select, and nothing in his testimony or in the evidence available to him at the time of his report points to Plaintiff as a reasonable suspect rather than any

of the other individuals with a similar name. Perry himself notes that Plaintiff has a similar appearance to Jessika McDonald. A jury could infer from this similarity that, even with a physical description of the suspect, Perry had narrowed the field of possible suspects down to two and chose Plaintiff rather than McDonald without any reasonable basis for doing so.

The Sixth Circuit's opinion in *Kentucky v. Young*, 51 F. App'x 543 (6th Cir. 2002) is instructive. In that case, evidence indicated an individual named Antwan Young was responsible for a crime. *Id.* at 545. A police detective searched a database for that name. The search produced two results: Antwan Cortez Young and Antwan Lawan Young. *Id.* The detective arbitrarily chose the second individual as the suspect and testified in support of a warrant. The Court of Appeals affirmed the denial of qualified immunity for the police detective, stating:

> In this case, the district court found that "[u]nder Plaintiff's version of the facts, Detective Burns did no more than 'flip a coin' before choosing between Antwan Lawan Young [appellee] and Antwan Cortez Young as the suspect . . . ." Viewing the case under this set of facts, which we must on this interlocutory appeal, we find that Detective Burns lacked probable cause to arrest and detain appellee. Furthermore, we are of the opinion that a reasonable detective would have known that she would be violating appellee's Fourth Amendment right by randomly choosing him from a list of two individuals without any basis for distinguishing between the two. Consequently, we hold that Detective Burns is not entitled to qualified immunity because her actions violated a clearly established constitutional right of which a reasonable person would have known.
>
> Additionally, we reject appellants' argument that this case is simply one of mistaken identity on the part of Detective Burns that lead to a mistaken arrest and, therefore, is constitutional under the Supreme Court's holding in *Baker v. McCollan*, 443 U.S. 137 (1979). Here, there was no mistake of identity—Detective Burns simply chose Antwan Lawan Young (appellee) instead of Antwan Cortez Young. Thus, this is not a case where Detective Burns chose A thinking it was really B; rather, this is a case where she chose A instead of B. Such a decision, while mistaken, was not one of mistaken identity. Moreover, she had no probable cause, at the time she made her choice, to choose either individual.

*Id.* at 547.

Drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could find that, like the detective in *Young*, Perry simply chose Plaintiff from a list of names without a reasonable basis for doing so.

Perry argues that the evidence demonstrates that he had probable cause to choose Plaintiff because Inspector Wise showed a picture of Plaintiff to Lewis in May 2020, and Lewis confirmed that Plaintiff is the one who stole his wallet. However, Lewis also stated that he had not seen Jacobs in a year and that Plaintiff looked "heavier" than he remembered. (Audio Recording, ECF No. 5-10.) Wise did not show Lewis a picture of any other Jessica Jacobs. Moreover, probable cause is determined at the time of the arrest and prosecution. Wise's investigation, which occurred long after the fact, has little bearing on that issue. Unlike Wise, Perry did not show Lewis a picture of Plaintiff.

Perry also argues that, as to Plaintiff's false-arrest claim, Plaintiff has not demonstrated the element of false statements or omissions critical to finding probable cause. However, a jury could find that, if Perry simply selected Plaintiff's name from a list of search results, the omission is the failure to disclose in his report that other individuals matched the name and/or description of the suspect. "'[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone.'" *Young*, 51 F. App'x at 546 (quoting *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (italics omitted)). Perry's report named Plaintiff as the suspect identified by the victim, which would amount to a reckless disregard for the truth if Perry arbitrarily chose Plaintiff from a list of names in the database.

As for Plaintiff's malicious-prosecution claim, Perry argues that Plaintiff has not shown that Perry participated in the decision to prosecute him. For instance, Perry testified that he never spoke with the prosecutor's office about his report. (Perry Dep. 37-38, 45.)

"The first element of the malicious-prosecution claim is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (quoting *Sykes v. Anderson*, 625 F.3d 294, 316 (6th Cir. 2010)). "This element is met when an officer includes 'misstatements and falsehoods in his investigatory materials' and those materials influence a prosecutor's decision to bring charges." *Id.* "[A] defendant's participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim under the Fourth Amendment." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015).

Here, Perry acknowledges that he requested the warrant and larceny charge. (Perry Dep. 44.) Also, a jury could infer that his report was the basis for the prosecutor's decision. (*Id.* at 59, 66; *see* Brady Dep. 8, 13 ("[T]he prosecutor approved the charge that Officer Perry wanted[.]"); Wise Dep. 103 ("A prosecutor issued a warrant based on the facts given to him.").) This evidence is sufficient to show that Perry influenced the decision to prosecute Plaintiff. These circumstances are different from the passive involvement of the officer in *Skousen v. Brighton High Sch.*, 305 F.3d 520 (6th Cir. 2002), who merely turned over a police report and evidence to the prosecutor's office. *Id.* at 529. In contrast, Perry requested a warrant and a specific charge against Plaintiff, and the prosecutor approved that request. Even if Perry "did not make the [final] decision to prosecute," that fact "does not per se absolve [him] from liability." *Sykes*, 625 F.3d at 311 (italics omitted).

10

Moreover, a jury could find that Perry's conduct was more than mere negligence or innocent mistake. It could find that he deliberately or recklessly identified Plaintiff as the suspect based solely on her name, knowing that there were other individuals with the name Jessica Jacobs. And it could find that he deliberately or recklessly omitted from his report the true basis for his decision and the existence of those other individuals.

In short, if the facts in dispute turn out to be like those in *Young*, then Perry is not entitled to qualified immunity. No reasonable officer could conclude that the similarity of Plaintiff's name to that of a suspect is sufficient to establish probable cause. And even assuming that Perry possessed a limited physical description of the victim (a fact in dispute) and used that description as a basis for his choice (another fact in dispute), a reasonable officer could not conclude that probable cause existed to identify Plaintiff as the suspect rather than Jessika McDonald or any other person with a similar name and/or physical description.

In other words, construing the evidence in Plaintiff's favor, this is not a case of mistaken identity; the evidence suggests that Perry had no reasonable basis for seeking a warrant for Plaintiff or any of the other individuals who appeared in his database search. That being the case, then Perry violated clearly established law. Accordingly, he is not entitled to qualified immunity and the Court will deny his motion for summary judgment.

An order will enter that is consistent with this Opinion.

Dated: May 25, 2021   /s/ Hala Y. Jarbou
HALA Y. JARBOU
UNITED STATES DISTRICT JUDGE